IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cr-226-7 |
| | ) | |
| BRIYON SHUFORD, | ) | |
|     Defendant. | ) | |
| | ) | |
| | ) | |

**BRIYON SHUFORD'S POSITION ON SENTENCING**

    Briyon Shuford, a 30-year-old man who has never before spent even a night in jail, was the first person to accept responsibility and plead guilty in this twelve-defendant case. He did so with little fuss or fanfare, despite a host of frustrating experiences since his arrest; he has faced contempt from other inmates, a false statement in search warrants, withdrawal of the original plea agreement he had accepted, and having had excessive force used against him at the D.C. jail. Despite all of these occurrences, which individually may not amount to much, but collectively etch away at one's morale, Mr. Shuford was able to look through the weeds with a clear head and understand what he needed to do. This is evidence of his forward-thinking, growth, and newfound ability to make good decisions even when he feels life has been unfair.

    Life *has* been unfair to Mr. Shuford. His home life as a young boy involved tragedy upon tragedy that no child should ever have suffer, as

described in more detail below. That is not to excuse Mr. Shuford's conduct, for which he is deeply remorseful and ashamed, it is only to put it into context.

Based on Mr. Shuford's background, swift acceptance of responsibility, the small measures of maturity he has displayed under difficult conditions while incarcerated, relatively minor criminal history, the collateral consequences he has already received, and all of the 18 U.S.C. §3553(a) factors, a sentence of 161 months is sufficient but not greater than necessary to achieve the goals of sentencing.

## Presentence Report

Mr. Shuford has reviewed the presentence report and objects to the two-point maintaining premises enhancement under §2D1.1(b)(12). As the parties have stipulated, the total offense level for Count 1 should be 21. The two-point maintaining a premises enhancement does not apply in Mr. Shuford's situation as both the government and defense agree. The plain language of the text requires that the *defendant* maintained a premises. *See* U.S.S.G. §2D1.1(b)(12)(emphasis added). The corresponding application note states that "[a]mong the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Ibid* (application note 17).

"[W]hether a defendant has 'maintained' a place is necessarily a fact-intensive issue that must be resolved on a case-by-case basis." *United States v. Morgan*, 117 F.3d 849, 857 (5th Cir. 1997). A Court "typically consider[s] whether a defendant (1) has an ownership or leasehold interest in the premises, (2) was in charge of the premises, or (3) exercised 'supervisory control' over the premises." *United States v. Barnes*, 803 F.3d 209, 216 (5th Cir. 2015) (citing *United States v. Soto-Silva*, 129 F.3d 340, 346 (5th Cir. 1997)). "These factors are not necessarily determinative alone, but should be considered together." *United States v. Guzman-Reyes*, 853 F.3d 260, 264 (5th Cir. 2017)(citing *United States v. Chagoya*, 510 Fed.Appx. 327, 328 (5th Cir. 2013). "[N]ot just any showing of dominion and control will suffice to support a maintenance finding[.]" *Morgan*, 117 F.3d at 856. Rather, the evidence should support "that the defendant exercised '*sufficient* dominion and control' over" the premises, or else 'dominion and control may fall short of maintenance.'" *Id.* (quoting *United States v. Roberts*, 913 F.2d 211, 221 (5th Cir. 1990)).

As the government and defense agree, Mr. Shuford's conduct does not warrant application of this enhancement. Mr. Shuford did not have any leasehold or ownership interest in the property; he was not in charge of the premises; he did not have "supervisory control" over the premises. *See Barnes*, 803 F.3d at 216. Therefore, the offense level should be 21 as the parties have stipulated in the plea agreement and as the government notes in

3

its position. *See Presentence Report*, ECF No. 118 at 40. Thus, the resulting Guidelines range should be 161-171 months.

## Argument

### I.    Legal standard

The overriding principle and basic mandate of 18 U.S.C. § 3553(a) requires district courts to consider a number of factors in order to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing as set forth in the statute.[1] The Guideline range, as one of many factors, is not binding. The Supreme Court has held that a defendant's Guideline range is truly advisory and that this Court is free to impose a sentence below the range. *See, e.g., Gall v. United States*, 128 S. Ct. 586, 602 (2007) ("the Guidelines are only one of the factors to be considered when imposing sentence"); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (noting that, after consideration of § 3553(a) factors and the "sufficient but not greater than necessary" requirement, a sentencing court may find that the case falls outside of the "heartland" contemplated by Guidelines, or that "the Guideline sentence itself fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless").

---

[1] These factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

## II. A sentence of 161 months is sufficient but not greater than necessary to achieve the goals of sentencing.

### A. Personal history and characteristics of Mr. Shuford

Mr. Shuford's childhood was marred by instability and abuse. His father was imprisoned and Mr. Shuford and his brother lived with their mother in a crime-ridden neighborhood in D.C. She worked during the day, and for a period of time while Mr. Shuford was four and his brother six, they were sexually molested by their male babysitter while his mother was away. After eventually reporting the abuse to their mother, she thankfully kept him away. Nevertheless, the home was far from tranquil.

Mr. Shuford's mother was abused by partners, and one in particular who was a drug user and dealer. He would routinely beat Mr. Shuford's mother while the two boys watched. At ages six and eight, they tried to protect her, but would be thrown out of the way or beaten themselves. This went on for years.

When Mr. Shuford was in eighth grade, his mother could no longer take care of him and his older brother. Mr. Shuford is not sure where his older brother went, but Mr. Shuford went to live with his grandmother. His grandmother worked full time and struggled to pay the bills. Mr. Shuford started ninth grade and was in and out of different high schools. At times he did well, and at other times he experienced violence and disruptions. At one point he went to California to attend a high school, but left after six months of being homesick.

5

Mr. Shuford ultimately graduated from Cardoza high school, having received good grades his last year. Mr. Shuford also began working at Wendy's when he was in twelfth grade, and transitioned to living with his stepmother. There, he held a series of jobs and began college. Unfortunately, financial problems caused him to leave school, and soon thereafter his girlfriend became pregnant with their daughter.

Mr. Shuford and his girlfriend moved to Florida where they both worked at Walmart. When their relationship ended, Mr. Shuford immediately left Florida to return to D.C. He began a relationship with the mother of his second daughter in 2018 which, after being on-again off-again, officially ended in 2023. The volatile relationship and unstable housing contributed to Mr. Shuford's periodic drug use, which at times reached dangerous levels in terms of mixing substances at significant quantities. He swung between cycles of agonizing withdrawals and perilous highs. The use finally started to slow in January 2024 except for daily marijuana use.

In 2021 Mr. Shuford got a job at the Office of Neighborhood Safety and Engagement (ONSE) in Washington, D.C. While it was a good job, and full of supportive and positive influences, the money (approximately $48,000 after taxes) was not enough to live on. He sold drugs to supplement his income and maintain a living. In the area where he lived it was such a part of the lifestyle that it was difficult to stay away, especially when money was already tight.

6

In total, Mr. Shuford has been shot at approximately 15-20 times throughout his life, but has never been hit by a bullet. He has been beat up countless times, sexually abused as a four-year-old, and essentially abandoned by his mother. None of this excuses Mr. Shuford's conduct, it simply adds background. When asked if he harbors any ill feelings towards his mother, Mr. Shuford's response was "No. She did the best she could."

### B.    Nature and role in the offense

Mr. Shuford's role in this offense is straightforward. He sold drugs, including with a firearm, and participated in a drive-by shooting against a rival crew, injuring four individuals. Of all people, Mr. Shuford, having experienced these horrors from childhood, knows how terrible this conduct is. This acknowledgement is present in his swift acceptance of responsibility, his genuine remorse, and his commitment to changing the trajectory of his life. Mr. Shuford wrote:

> I'm sorry for selling drugs in and around my community, for carrying an illegal firearm. I'm sorry for the four victims I hurt when I chose to seek revenge and get street justice. I should have let the justice system do there[sic] jobs or just left it in GODS hands. I'm sorry letting my family and friends down, especially my daughters and the kids that look up to me. I wish I could've been the positive role model I know I can be and lead by example. Straddling the fence between good and bad got me into this situation, but I'm ready to pay my debt and come out all good. I've started rehabilitating myself by disconnecting from my codefendants and the community to focus on being a better more positive person.

*PSR*, ECF No. 118 at 17; [forthcoming] Def.'s Ex. 1 (handwritten version of the letter copied in the PSR).

The numerous letters from Mr. Shuford's family attest to Mr. Shuford's true nature as generous, caring, and kind.

Morgan Tinsley wrote, "[w]hen I was in college a few years ago Mr. Shuford would make sure that if I didn't have a ride he would do drop offs and picks up. When I needed funding for books, he would be the one to make sure that I had every material I needed to graduate." Def. Ex. 2.

Mr. Shuford's daughter's mother stated:

> Briyon has been an integral part of our daughter's life since the day she was born. While our relationship has had its challenges, as parents, we have always made a conscious effort to co-parent with respect and prioritizing our daughter's emotional and physical needs. From the very start, he has been present in her life in every possible way—emotionally, financially, and physically. He has been a loving and devoted father.

*Ibid.*

Mr. Kemonté Martin explained that he works a good job with the D.C. government because of Mr. Shuford who helped him obtain that employment. *See ibid.*

Mr. Shuford's stepfather attested to Mr. Shuford's work ethic and dedication, explaining:

> While Briyon lived with us, I saw firsthand the young man he was becoming. He worked hard to balance three jobs while preparing for college at Allegany once he graduated high school. That kind of drive at his age was something I admired. Briyon and I bonded over our shared love of sports, we'd debate for hours about football and basketball, and he'd often talk about playing sports in college. He often spoke of life after getting his degree, getting married and having children as he called "the good life" like mine.

…

8

> Even before fatherhood, Briyon's nurturing side showed in how he cared for his autistic sister, Kennedy. He had a way of connecting with her when she was non-verbal that none of us could replicate. She was drawn to him because of his patience and love, and I'm so grateful for the role he played in her growth.

*Ibid.*

Mr. Shuford's sister-in-law expressed Mr. Shuford's desire to change the trajectory of his life, stating:

> This combination of childhood struggles and personal loss has motivated Briyon to seek healing and growth. He has expressed a sincere desire to address the impact of these experiences through counseling, which he sees as a key step in understanding and processing his emotions. I believe this determination to better himself speaks to the kind of person Briyon is—someone willing to do the hard work necessary to grow and make positive changes.

*Ibid.*

Mr. Shuford's friend, Ms. Womack provided similar sentiments:

> I recognize that Mr. Shuford is facing challenging circumstances today, and he deeply regrets the choices that have led him here. However, I firmly believe that these actions do not define him as a person. Mr. Shuford has expressed his commitment to learning from this experience and making amends. Given the opportunity, I am confident he will use this as a turning point to continue his positive contributions to his family and community.

Mr. Shuford is more than the terrible conduct in which he engaged. He is a hardworking man of intelligence who is dedicated to his family, and who is committed to making sweeping changes in the trajectory of his life.

 

  

**C.   Criminal history category II overstates Mr. Shuford's past conduct.**

Prior to this offense, Mr. Shuford, who is 30 years old, had never been charged with, let alone convicted of, a firearm or drug offense. In fact, he had never even been charged with any felony. At a category II, Mr. Shuford's criminal history is overstated. In submitting this argument, Mr. Shuford

10

understands, acknowledges, and does not dispute that the sentencing guidelines range is 161-171 months as detailed in the Rule 11(c)(1)(C) plea agreement and that this is the appropriate range. He is not moving for a departure from this guidelines range. Nevertheless, it is still important for the Court to consider the ways in which a criminal history category II overstates the seriousness of Mr. Shuford's past conduct because these reasons provide support for a sentence at the low end of the agreed-upon range.

Prior to this case, Mr. Shuford had never even spent a single day in jail and had no felony convictions, or even felony charges. He is assessed two criminal history points; one for a misdemeanor destruction of property that occurred approximately six years ago for which he received fifteen days all suspended, and one point for assault on a police officer (APO) that occurred almost ten years ago for which he received 90 days all suspended. This APO conviction was set aside under the Youth Rehabilitation Act, (YRA) and while it technically counts for a point under the guidelines, both the age of the offense and the spirit of the YRA itself distinguishes it from other far more recent and/or serious convictions that would garner an equal criminal history point. If the YRA offense did not count, Mr. Shuford would only have one point and be in category I.

Mr. Shuford's criminal history at 2 points is already the lowest one can have in category II. At a category II, Mr. Shuford, with a stale misdemeanor

11

and an even older Youth Act offense is in the same category as someone who more recently committed three felonies with no jail time. He is in the same category as someone who has a single murder conviction and served over twenty-five years in prison. In fact, Mr. Shuford was not even a convicted felon at all. Having a ten-year-old Youth Act offense coupled with a misdemeanor destruction of property offense, neither of which resulted in any active jail time, launch Mr. Shuford from a criminal history category I to II substantially overrepresents the seriousness of his past conduct. Again, Mr. Shuford does not dispute that the sentencing range of 161-171 months is correct and is not requesting a departure, he simply asks that the Court consider these arguments as another reason to sentence him at the low end of that range.

### D.   Need to avoid unwarranted sentencing disparities

The JSIN data supports a sentence of 161 months. Even using the disputed offense level of 23 and a criminal history category II, the PSR notes that for the ten defendants whose primary guideline was §2D1.1 and who were convicted of at least one count of 18 U.S.C. §924(c) involving fentanyl, the average length of imprisonment was 90 months and the median sentence was 87 months. *See* PSR, ECF No. 118 at 39. Of course this does not include the conviction under the D.C. Code. Adding a 60-month consecutive sentence for the D.C. Code offense, would make the result 150 months which is almost

12

a year below the low-end of the agreed sentencing range and almost 2 years below the high end of that range.

As to the disparities in Mr. Shuford's case specifically, Mr. Shuford's co-defendant Douglas recently pled guilty, but has not been sentenced. He has a prior conviction for possession with intent to distribute cocaine and pled guilty to distributing fentanyl and PCP, and possessing ammunition in connection with another felony offense. After an adjustment for a firearms enhancement, the guidelines in his plea agreement are 24-30 months imprisonment.

Mr. Shuford's requested sentence of 161 months, is over a decade more than the middle of his co-defendant's range. Therefore, a sentence of 161 months properly accounts for Mr. Shuford's more serious conduct while avoiding an unwarranted disparity.

### E. A sentence of 161 months fulfills the need to protect the public, promote respect for the law, and provide just punishment and deterrence.

A sentence of 161 months is a long and harsh sentence. It will be enough to protect the public, promote respect for the law, and provide just punishment and deterrence. In facing several recent frustrations, Mr. Shuford has already shown that he has grown considerably from this experience and is capable of making good choices in the future, not allowing adversities to veer him from the right path of accepting responsibility.

First, Mr. Shuford was confronted with a false statement in search warrants against him. Specifically, the image of a text message exchange in the government's detention memorandum (ECF No. 39 at 12) shows the following text exchange between Mr. Shuford and defendant, Bassil:

| Date/Time | Number | Name | Message |
|---|---|---|---|
| 06/05/2023 23:46:30 | (240) 302-6434 | Jamiek Bassil | Bring me a 3.5 down |
| 06/05/2023 23:46:36 | (240) 302-6434 | Jamiek Bassil | I'm 3 minutes away |
| 06/06/2023 22:55:00 | (202) 321-0668 | Briyon Dwayne Shuford | Yoooo |
| 06/07/2023 23:43:25 | (240) 302-6434 | Jamiek Bassil | Outback |

In the prior applications for search warrants, however, law enforcement's recitation of this same text is in quotes and falsely claims the text states "Bring me a 3.5 *of* down." (emphasis added). Law enforcement's inaccurate insertion of the word "of," coupled with its subsequent interpretation, appears to be an attempt to alter the text message to conform with law enforcement's assertion that "down" is fentanyl rather than the obvious implication that "down" means *downstairs*; i.e., that the person who is approaching the bottom of an apartment building is asking the resident above him to bring a 3.5 of something undeterminable downstairs.

Nevertheless, despite this objectively false statement being used against him, Mr. Shuford did not allow his frustration to cloud his judgment. He accepted a plea offer that had been extensively negotiated between the parties and the basic terms of which had been approved and outlined over email. It took time for Mr. Shuford to fully process the realization of the

many years of incarceration he would inevitably serve under that agreement, but he eventually found that acceptance.

From there, though, things still did not proceed smoothly. When the actual paperwork went up to supervisors, the plea offer was revoked by management based on a different understanding of the guidelines, and Mr. Shuford was no longer allowed to accept the plea he had just agreed to accept. The sentencing range increased and he was asked to simply swallow that pill. And he did, humbly and with dispassion. Mr. Shuford faced suspicion and contempt from other inmates who were wary of his swift plea process, but Mr. Shuford maintained his resolve to accept responsibility and begin a new course for his life.

Even then, however, the system did not stop throwing frustrations Mr. Shuford's way. This time it was in the context of abuse at the D.C. Jail. Mr. Shuford's Exhibit 3 and its accompanying background is filed under seal pursuant to the Department of Corrections' protective order and limited modification. *See* ECF Nos. 103, 119.

Each of these adversities, which perhaps individually may not amount to much, cumulatively yield an overwhelming feeling of powerlessness, injustice, and insignificance in a system simply steamrolling on. None of this is raised as an excuse for Mr. Shuford's conduct. It is simply to show the Court that Mr. Shuford can, and has, displayed the maturity and fortitude, to make better decisions in the future, even when the road gets rough. Here,

Mr. Shuford did not allow these frustrations to veer him from the right path of accepting responsibility for his wrongdoing. He fully admitted to his conduct and expressed genuine remorse.

Mr. Shuford is not a lost cause. He has strong family and community support. He is intelligent, persevering, and committed to seeking the proper mental health and substance abuse treatment. The periods of stability he experienced in his life were when he lived with his stepmother, a magnanimous and caring individual who has supported Mr. Shuford in her loving household even after the relationship with Mr. Shuford's father ended. This home is where he plans to return upon eventual release. There, he commits to re-engaging with the positive influences in his life, furthering his education, and receiving appropriate mental healthcare.

In fact, Mr. Shuford, who has had years-long substance abuse problems, has never received any substance abuse treatment. And despite the tragedies that have been inflicted upon him as a child, he has never received any mental health counseling. Mr. Shuford asks that he have a chance to participate in these treatment programs, a chance to heal and develop coping mechanisms. In that sense, Mr. Shuford is differently positioned from someone who has been in and out of treatment, failing time after time. Mr. Shuford has never even had that chance to succeed in treatment.

Given how he has responded to current obstacles, there is reason to believe that he will similarly be able to exercise better judgment on the

16

outside. Additionally, as the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, (in Mr. Shuford's cases, no previous incarceration) might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

Finally, Mr. Shuford's time spent under excessively harsh treatment, (both the abuse itself and the three weeks of punishment Mr. Shuford received as post-hoc justification for it) should count for more than day-for-day incarceration. *See e.g. United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011)("[W]e have held that a district court may reduce a sentence to account for the harsh conditions of pretrial confinement[.]")(citing *United States v. Pressley*, 345 F.3d 1205 (11th Cir.2003)); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001)("[P]re-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."). In the military context, unusually harsh conditions of pretrial confinement may result in the days being counted as double time. *See* 2024 Rule For Courts-Martial 305(l)(military judge may award additional day for day credit for unusually harsh conditions). Since the Court cannot compel the Bureau of Prisons to calculate time in this particular manner, accounting for this excessively harsh treatment can be achieved by sentencing Mr. Shuford to the low end of the Rule 11(c)(1)(C) guidelines range.

**F.   Conclusion**

For all of these reasons, a sentence of 161 months is sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,
BRIYON SHUFORD
By Counsel

_____/s/_____
Jessica Carmichael, DC Bar 998952
CARMICHAEL ELLIS & BROCK
Counsel for Defendant
108 N. Alfred Street, 1st Fl
Alexandria, Virginia 22314
phone: 703.684.7908
jessica@carmichaellegal.com
